In the Estate of Rosina Merle Carr, Deceased.

Edward A. Loss, Jr., Petitioner-Appellee, v. Continental Illinois National Bank and Trust Company of Chicago, as Successor Executor of the Will of Rosina Merle Carr, Deceased, Mabel Merle Curran, Individually and as Executor of the Will of Henry J. Merle, Deceased, John M. Boyle, and Henry Joseph Roach, Respondents-Appellants, Barbara Ann Loss, a Minor, Respondent-Appellee.

Gen. No. 53,272.

First District.

June 26, 1970.

Sidley and Austin, of Chicago (Alice M. Bright, William H. Thigpen and Sylvia O. Decker, of counsel), for respondents-appellants.

Friedman, Armstrong and Donnelly, of Chicago (Edwin R. Armstrong, James R. Donnelly and James T. Friedman, of counsel), for petitioner-appellee.

Ira D. Schultz, of Chicago (Sidney Z. Karasik, of Chicago, of counsel), for respondent-appellee.

ALLOY, J.

The record in this cause indicates that the decedent, Rosina Merle Carr, executed a will on September 7, 1949. After her death on June 5, 1966, no last will could be located. A copy of the 1949 will was then admitted to probate on November 18, 1966, as a lost will, on a petition for probate of such will. Petitioner, one of 17 heirs of Rosina Merle Carr, thereafter filed a petition to contest the will on the theory that the 1949 will had been revoked and destroyed by the testator. Appellant-respondents filed a motion to dismiss on the ground that the question of revocation of the 1949 will had already been passed upon at the hearing held in connection with its admission to probate, and that the question of revocation of the 1949 will was thus res judicata. The trial judge denied the motion to dismiss. The court thereafter heard the petition to contest the will, sitting without a jury, and found that the will of September 7, 1949, was not the will of the decedent Rosina Merle Carr.

The trial court order thereupon set aside the previous order admitting the will to probate and declared that the decedent died intestate. The trial court had appointed as the successor executor Continental Illinois National Bank and Trust Company (following the death of the executor first named). The court also fixed the fees of said bank at $750.

On appeal in this Court, appellants contend that the order admitting the copy of the will to probate on November 18, 1966, was res judicata and that the trial court erred in permitting the second hearing on the merits on the issue of admission of the carbon copy of such will. Appellants also contend that the trial court's decision was contrary to the manifest weight of the evidence and that the trial court erred in specifying the fees and expenses of the executor.

In considering matters relating to will contests, it is vital to give careful attention to the facts of the case under consideration. In the cause before us the decedent, Rosina Merle Carr, was not survived by a husband or any descendants, but her heirs were brothers and sisters and children of deceased brothers and sisters. She left as heirs a brother, Henry J. Merle; a sister, Bertha Merle Boyle; one niece (a daughter of a deceased brother, William); two nephews (sons of a deceased sister, Maude Henn); five nephews (children of a deceased sister, Annie Roach); a niece and a nephew (children of a deceased sister, Mary Loss); and five grandnieces (children of a deceased nephew, William Loss). The heirship, therefore, if decedent died intestate involves a division into six shares, one to a brother, one to a sister, one to one niece, one to two nephews, one to five nephews, and one share to the Loss family (a niece, a nephew and five children of a deceased nephew being involved).

The significant facts are not in dispute but the parties differ in inferences and emphasis on such matters of fact.

It was shown of record that decedent made a will in 1929, and then again in 1939, and that both times she sent a copy of the will to her brother Henry J. Merle. On September 7, 1949, Mrs. Carr executed a will in the law office of Daniel S. Jerka in Chicago. Her brother Henry Merle had talked with her about the will when she was planning it. Mrs. Carr took the original will with her and she also mailed a copy the same day. The chief asset of Mrs. Carr's estate was a $4/12$ interest in the William F. Merle, Sr. Trust. This trust owned a little over $1/3$ of the stock in Riverview Park Company, which allowed such trust to elect two directors to the Riverview Park Board. By the terms of the 1949 will, decedent bequeathed her interest in the Trust and the residue of her property $1/6$ to Mabel Curran (a daughter of Mrs. Carr's brother, Henry Merle), $1/6$ to John Boyle (son of decedent's sister, Bertha), $1/6$ to Henry Roach (a nephew), and $1/2$ in trust for William O'Toole, Jr. (a nephew). There was a provision in the will that if any of the four beneficiaries were to predecease the testatrix, the will provided that the share of the person so dying was to pass to the remaining designated beneficiaries. Since William O'Toole, Jr. died in 1955, the property under the terms of the will would go $1/3$ each to Mabel, John, and Henry, and all of Mrs. Carr's other nephews and nieces would be disinherited.

The record indicated that Mrs. Carr had a close relationship with her brother, Henry J. Merle, and that she discussed her will and financial affairs with him on numerous occasions. The testimony also indicated that Mrs. Carr was close to her sister, Bertha, and to Bertha's son, and that she also had a close relationship with Mabel Curran. There was also testimony that Mrs. Carr had a close relationship with all of her relatives with the possible exception of Edward Loss, Jr., a nephew. Edward Loss had objected to William O'Toole being buried in the Merle family cemetery lot and had also in-

stituted an action to have a conservator appointed for his mother. Mrs. Carr, however, was on good terms with the rest of the Loss family and had sent four of William Loss's daughters to high school and helped other Loss children in college. The record indicates that Mrs. Carr had never said a bad word about any of the heirs and helped all members of the various families.

After the death of William O'Toole in 1955, Mrs. Carr talked with her brother, Mr. Merle, about her will. She stated according to the testimony of Mr. Merle, "Now, Billy is dead and there need be no provision for him in my new will." She also mentioned at this time that she wanted to make some provisions in regard to the Merle Trust. Mr. Merle took her to see an attorney and although the attorney even wrote to Mrs. Carr offering his assistance, Mrs. Carr appeared never to have written a new will. At one time, Mrs. Carr talked to the attorney and told him that one day she was going to see him about a will. Her brother, Mr. Merle, saw the original 1949 will in 1955 when he sent a carbon copy of the will to an attorney in California. He also saw the will in December of 1959 when Mrs. Carr brought the will to Mrs. Boyle's apartment.

Mr. Merle testified (and also his daughter Mabel Curran) that Mrs. Carr once stated that she wished the Riverview stock to be held as a unit and not to get into the hands of strangers or any disgruntled people or the Loss family. Mr. Merle and Mabel Curran were the only parties testifying to this statement by Mrs. Carr.

In 1963, Mr. Merle asked the attorney to call Mrs. Carr about making a new will. The attorney did call Mrs. Carr and she stated she still had some things to think about and would let him know. In that same year of 1963, Mrs. Carr showed Mr. Merle a letter from the attorney and she told Mr. Merle, "I've got to do something about my will."

In February 1966, just a couple of days before she was to go to the hospital, she talked with her brother, Mr. Merle, in her apartment. After discussing the Merle Trust and the stock in the Riverview Corporation, Mrs. Carr went to her desk and got the original will and brought it over to Mr. Merle. She stated that she was going to leave her interest in the Trust to Mr. Merle. She also asked him what disposition she should make of her estate. Mr. Merle testified that he could not do this as someone might accuse him of influencing her. Mrs. Carr then asked Mr. Merle (February 1966) if he would check to see if the witnesses on the 1949 will were still alive in case something should happen to her between then and the time she might make a new will. She then placed the 1949 will back in her desk drawer. This was the last time Mr. Merle or anyone saw the 1949 will. After the trip to the hospital at that time, Mrs. Carr returned to her apartment. The record indicates that Mrs. Carr kept the will in her apartment, where she also kept a few securities. She was extremely careful with her papers and even used receipts when giving someone a copy of her will. It was clear from the record, also, that Mrs. Carr was in possession of all her faculties until the time of her death, although she was 76 years old in 1966. Mr. Merle also testified that on June 1, 1966, Mrs. Carr said to him, "If you won't help me with my will I'll tell you what I'm going to do. I'm going to leave it all to you and let you worry." On June 2, 1966, Mrs. Carr became ill. She called Barbara Loss, widow of the deceased nephew of Mrs. Carr, and told Barbara that if she could not make it to the graduation for Mrs. Loss's daughter, she would call her. She also mentioned that she put money in an envelope for the grandniece as a graduation gift. When Mrs. Carr was directed to go to the hospital on the morning of June 2, 1966, she had the hotel bellman plug her apartment door as she

467

was leaving for the hospital. Her maid saw the door plugged when she came to work the next day. Mr. Merle saw Mrs. Carr in the hospital but she never mentioned her will. She died on June 5, 1966. About four or five hours after her death, Mr. Merle, decedent's brother and his daughter, Mabel Curran, went to Mrs. Carr's apartment to pick up some clothes to take to the undertaker. The doorman unplugged the door for them and they remained in the apartment and plugged it again when Mr. Merle and his daughter left.

It was shown that when the door is plugged it could only be opened with a special key which is kept at the hotel desk. There was testimony that at one time when Mr. Merle was in the apartment, the hotel manager took a prospective tenant to the apartment for the purpose of showing it to the prospective tenant. The original will was never located, although a carbon copy of the will was found in a lock box in a locked closet.

As we have indicated, a petition was filed to probate the carbon copy of the lost will. The heirs and beneficiaries designated in the will were notified of the date of the hearing held on the petition to probate the carbon copy of the will. At such hearing on probate of the lost will, probate was objected to by the guardian ad litem for a minor heir, but following a hearing, the carbon copy of the presumably lost will was admitted to probate. Edward Loss, Jr., an heir of decedent, who did not appear at the probate hearing, thereafter filed a petition to contest the will of decedent Rosina Merle Carr, alleging that the instrument admitted to probate as the last will of decedent was not her will since it could not be found at her death and was revoked and annulled by the decedent destroying it with intention to revoke it.

Following a full hearing on the petition to contest the will, as we have indicated, the trial court found that the 1949 will of Rosina Merle Carr had been revoked and the order admitting it to probate was set aside and vacated.

The evidence and testimony of Henry J. Merle was read into the record at the time of the will contest since he had died following the time of hearing on probate and before the trial and hearing on the will contest. The basic question before the court for determination is whether the trial court was correct in permitting a full hearing on the question of whether the 1949 will had been revoked.

On appeal in this Court, appellant-beneficiaries under the 1949 lost will contend that the probate of the lost will is a different type of probate proceeding, which makes this case the exception to the general rule governing probate of wills and will contests. It is a contention of appellants that when the lost will is offered for probate, any evidence as to its execution or revocation may be presented by either the proponents or opponents. It is contended that this warrants the application of the doctrine of res judicata. No Illinois cases have decided this precise issue so that it is valuable to look to the history and purpose of the Illinois Probate Act and the precedents in this State in determination of this issue.

■ Originally, in the State of Illinois, on the probate of a will, only the attesting witnesses were competent to testify. Objectors, however, were allowed to present evidence of fraud, compulsion, and other improper conduct in order to prevent the probate of a will. It was soon recognized that if an unscrupulous witness to a will would testify falsely in regard to execution of the will, or the mental capacity of the testator, the proponents of the will would never be able to get the will probated since they had no right to introduce other types of evidence to support the will. This rule was changed to provide that if the probate of the will was refused, on appeal to the Circuit Court, the proponents could offer evidence in addition to the testimony of attesting witnesses. This rule was also relaxed even further in 1909 to pro-

vide that proponents could offer additional evidence on appeal from the probate court even if the will was admitted to probate. During the entire period (and still retained as a part of the statutory probate law in Illinois), the rule was maintained that those opposing the probate of a will are limited, as to evidence which they can present when the will is probated, and may only present evidence showing fraud, compulsion, or other improper conduct (1967 Ill Rev Stats, c 3, § 69).

The early Illinois case of Stuke v. Glaser, 223 Ill 316, 79 NE 105, restricted evidence of fraud to proof of a trick or a device by which the testator was induced to sign something not realizing it was a will. "Compulsion" was restricted to actual constraint or pressure amounting to duress and "other improper conduct" was defined to be conduct similar to a trick or duress performed on the testator. The procedure relating to probate and contests of wills, involved, initially the offer of probate in the county or probate court, with an appeal to be taken to the Circuit Court where the matter could be heard de novo. Thus, the probate proceedings either at the probate level or on a trial de novo were limited as to what evidence could be presented. The protection given to those opposing a will was that they could bring a will contest proceeding and attack a will upon any grounds, such as lack of testamentary capacity, improper execution or revocation. The will could also be attacked on grounds of fraud or duress, even though the contestants had been given the right to present evidence on these issues at the original probate level and also at the trial de novo in the Circuit Court. If a question of fraud arose on a will contest, the fact that such issue had been heard in probate and relitigated in the Circuit Court did not mean that the issue was res judicata. In Buerger v. Buerger, 317 Ill 401, 148 NE 274, the issue of undue influence was raised in probate, raised again on appeal in

the Circuit Court and carried all the way to the Illinois Supreme Court. After all of this proceeding, the will contest was filed and undue influence was set out as the ground for contest. It was argued in that case that the question of undue influence was res judicata since the issue had been litigated all the way to the Supreme Court. The court, however, held that the question of undue influence was not res judicata and could be raised in a separate will contest action.

Appellants in the cause before us agree that these established principles of probate practice, as they have developed over the years in Illinois, are still valid in most situations. They argue, however, that the probate of a lost will is an unusual type of probate procedure which should allow the application of the res judicata principle. They agree that if the original will had been produced for probate, the only outside evidence that could have been offered on probate would have been fraud, compulsion or similar improper conduct. They agree that in such case there could be a contest of a will on any grounds. Appellants argue, however, that when a lost will is offered for probate, those opposing the probate may offer any evidence which touches upon the loss of the will. They contend, on this basis, that the issue relating to a lost will creates a different situation and that the doctrine of res judicata should be applied in a later will contest. We do not agree with this contention.

 The purpose of the Probate Act is to permit an administration to get under way as quickly as is reasonably possible and yet to permit those who wish to question the will an adequate opportunity to test the validity of the will. The Probate Act (1967 Ill Rev Stats, c 3, § 64) provides for mailing a notice to the heirs, devisees and legatees, which notice is to be sent not less than 20 days prior to the hearing. Such notice is by mail and not personal service. If the doctrine of res judicata

was applied where a lost will is offered for probate this would be a violation of the whole spirit and intent of the Probate Act. Most cases considering will contests emphasize that those opposing a will should be given time to investigate the circumstances surrounding the execution and possible revocation of the will before bringing a will contest action. At one time in this State contestants had five years in which to file a will contest. As stated in Dowling v. Gilliland, 275 Ill 76, 79, 113 NE 987:

> " 'The proceeding is statutory, the object being to give the contestant of a will an opportunity to thoroughly investigate all the circumstances relating to the execution of the will, the capacity of the maker thereof to execute the instrument, and other facts affecting the validity of the will.' "

Similarly, as stated in Sternberg v. St. Louis Union Trust Co., 394 Ill 452, at 459, 68 NE2d 892:

> "The purpose of allowing a will to be contested after it has been admitted to probate is to give to the contestant an opportunity to thoroughly investigate all the circumstances relating to the execution of the will, the capacity of the testator, and other facts affecting the validity of the will."

We, therefore, conclude that to require those opposing probate of a lost will to fully litigate the question of whether such will was revoked by destruction, at the time a copy of such instrument was offered for probate, would be inconsistent with the spirit and objective of the Probate Act. It would put a hardship on those opposing probate of a lost will by requiring them to make the necessary investigation and other activity on the basis of a short 20-day notice by mail. If those opposing the probate were to seek continuances in order to have time to investigate it fully, then the entire probate of

the estate is delayed and the estate could well suffer loss and inconvenience. With the elimination of trial de novo by appeal to the Circuit Court, those opposing probate of a lost will would be required to present their entire case when the will was first offered for probate on the basis of only 20 days' notice. The problems would be insurmountable when one of the heirs lives at a considerable distance from where the will is to be probated (such as Edward Loss, Jr., the appellee-petitioner in the instant case). We also are conscious of the fact that when a will is offered for probate, even if it is only a copy of a lost will, there is no provision in the statutes allowing a jury trial on the question of validity of the will. If the probate hearing made the question of revocation of the will res judicata, then the persons contesting such will would be denied a jury trial on such question.

While there is no exact precedent on the issue before us, the cases to which we have referred, as well as others, indicate that the doctrine of res judicata should not be applicable in this situation. In Sternberg v. St. Louis Union Trust Co., 394 Ill 452, 68 NE2d 892, a Missouri resident had made out a will in Missouri and then married after making the will. Following his death as a resident of Missouri, the will was also offered for probate in Illinois, as the testator owned Illinois real estate. The Illinois County Court admitted an authenticated copy of the original Missouri will to probate. A will contest was filed in Illinois upon the theory that marriage in Illinois revoked the will. It was contended by those seeking to uphold the will in Illinois that it was not proper to contest the will in Illinois on the theory that it was revoked, as it had been properly admitted to probate in this State. The court rejected this contention and emphasized the right to contest a will on any valid grounds, when it stated, at page 459:

"A will after it has been admitted to probate may be contested on any grounds including its revocation."

The court emphasized that when a will is contested, the question is whether the will is the valid last will of the decedent, and not whether it was properly admitted to probate. Other cases following the same reasoning are Dowling v. Gilliland, 275 Ill 76, 113 NE 987; Buerger v. Buerger, 317 Ill 401, 148 NE 274; and Shelby Loan & Trust Co. v. Milligan, 372 Ill 397, 24 NE2d 157.

In Dowling v. Gilliland, supra, a will had been admitted to probate which had written across the face of the instrument a notation, "This is no good. Changed my mind." In a will contest those seeking to support the will contended that the question of revocation was res judicata since the probate court had already passed upon the issue. The Illinois Supreme Court, however, stated that the right to file the separate will contest was not lost and emphasized, at pages 79–80:

> "The action to contest a will is a statutory proceeding, and there must be an order admitting the will to probate before the bill will lie. In a will contest the question whether the will was properly or improperly admitted to probate is not the issue. The question of the validity of the will is raised for adjudication on its merits, unaffected by the action of the probate court. The issue in a suit to contest a will is whether the writing offered as the will of the deceased is his last will and testament, and not whether it was erroneously admitted to probate."
>
> · · · · · ·
>
> "The grounds upon which a will may be contested under section 7 are not restricted, and any ground which, if established by proof, would invalidate the will may be made the basis of a contest under said

section if the bill is filed within the time limited by the statute.. . . . That the writing offered as the will of decedent has been revoked or that some part of it has been annulled or destroyed are proper grounds for contesting ´the will under the statute."

■ In the case of Buerger v. Buerger, supra, it was contended that the question of undue influence could not be litigated in a separate will contest proceeding since the issue had been contested on the probate hearing at the time of admission of the will, and was, therefore, res judicata. The court in that case indicated clearly that probate of a will is a special statutory proceeding in which the character and quantity of proof required has been carefully limited by statute. It is pointed out, in that case, that the judgment rendered is merely that the will be admitted to record, and that judgment is not final but subject to being set aside by a proceeding in equity begun within a limited time after probate. While there is a difference in facts in the cases to which we have referred and the facts in the instant case, we do not believe that the difference in facts warrants an exception to the general rule that an Illinois will can be contested on any grounds which show such instrument to be invalid. The fact that a lost will is involved should not alter the established rule in this State. The question of revocation may be raised in a will contest. Under 1967 Ill Rev Stats, c 3, § 90, an action to contest the validity of a will may be instituted and there is nothing in the statute which limits the ground of the contest. We believe it would be inconsistent with the spirit and intent of the Probate Act to read into such act an exception which would apply the doctrine of res judicata to situations where a lost will is probated.

■ In the case of Bley v. Luebeck, 377 Ill 50, 35 NE2d 334, there was an appeal to the Circuit Court which re-

475

sulted in a trial de novo and a circuit judge refused to allow any evidence by those opposing the will which tended to show that the testator revoked the will in his lifetime. The Supreme Court on appeal found such ruling to be erroneous and stated (at page 64):

"The loss or destruction of the will itself necessarily brings into the hearing issues upon which the proponents and the contestants both have the right to offer general evidence on those issues which are not present in a case where the will is in existence."

It was pointed out in the Bley case that the purpose of the act is that prima facie execution of the instrument and the capacity of the testator to make it his last will and testament may be shown, so that the estate may be cared for and its administration proceed. The right of anyone interested to contest the validity of the will at any time within a year of its probate, the court stated, is given by statute and until the expiration of that time, the probate of the will is not conclusive and all facts necessary to establish the will in chancery are open to inquiry (at page 61). The Supreme Court in such case was simply referring to the fact that those opposing a will could not offer any proof they wished to at the probate level or on appeal at the Circuit Court level. This statement was not intended as and could not be expanded into, a determination that the doctrine res judicata would apply in a will contest.

Similarly, the case of Mather v. Minard, 260 Ill 175, 102 NE 1062, does not support appellant's position. In that case a will had been admitted to probate and a will contest was then later filed alleging that the will which had been probated had been revoked by a later will. The Supreme Court would not allow the question of revocation of the probated will by a later will to be raised in the will contest. The basis for this determination was that the newly discovered will, which it was

alleged revoked the probated will, would first be required to be probated.

■ It is, therefore, our conclusion that where a lost will is involved it may be contested on any grounds, including its revocation, in a will contest, and the court may retry any issue therein involved since the doctrine of res judicata has no application in the will contests under such circumstances.

■ Another issue which was raised on appeal is whether the decision of the trial judge is contrary to the manifest weight of the evidence. Two Illinois cases have defined the test to be used on the issue of when the lost will should be sustained. In In re Estate of Morgan, 389 Ill 484, 59 NE2d 800, it is pointed out that there is a presumption that a will has been destroyed by the testator with the intention of revoking it, and the burden is on the one seeking to probate the will to prove that it was not revoked at the testator's death. The presumption can be rebutted by circumstances which tend to show a contrary conclusion. In In re Estate of Moos, 414 Ill 54, 110 NE2d 194, the Morgan case was cited with approval and the court there stated that there is a presumption that the will was destroyed by testator with the intention of revoking it. It is also pointed out that this presumption may be rebutted by circumstances which tend to show a contrary conclusion and that the burden is on the one seeking to probate a will to prove that it was unrevoked at testator's death. The issue in the present case, therefore, is simply whether the proof clearly overcame the presumption of revocation in the instant case. As indicated in the statement of facts, all the actions and statements of the testator could be just as indicative of a conclusion that she did not wish to die leaving her December 7, 1949 will to dispose of her property, as it would be to a conclusion that she had not revoked the will by destroying it. As stated in In re Estate of Moos, supra, at page 62:

"Taken in its entirety, we believe that the proof is not sufficient in quality or quantity to show that it is unlikely that the testator would revoke his will, or to create a moral conviction that he did not revoke it. The circumstances shown by the evidence are equally, if not more, consistent with the thought that the testator changed his intentions relative to the disposition of his property and destroyed the will himself. However, even accepting the appellants' evidence in its strongest light, we are of the opinion that it is not of a nature satisfactory to rebut the presumption that the will was revoked by the testator or to establish the manner in which his estate should be distributed."

In the instant case it is clear that Mrs. Carr had been wrestling with the problem of making a new will for eleven years from 1955 until the time of her death following the death of Billy O'Toole. If all she intended to do in revising her will was to eliminate the provision for Billy O'Toole, it was not necessary that she do anything since her 1949 will left Billy O'Toole's share to Mabel Curran, John Boyle and Henry Roach in the event Billy O'Toole predeceased her. On the basis of the evidence the court could properly have concluded that Mrs. Carr did not want Billy O'Toole's share to pass to these three persons or she would not even have considered changing her will after Billy O'Toole's death. The court could properly have concluded that her constant reference to wanting to make a new will was an indication by Mrs. Carr that she wished to benefit some of her other nieces and nephews or even her brother, Henry Merle, but couldn't make up her mind how she wished to do it. All of the circumstances in the case point to a plausible conclusion that Mrs. Carr could not make up her mind which of her relatives to favor under her new will and that as a result she destroyed her 1949

will prior to entering the hospital for the last time on June 2, 1966. Whether she felt that destroying her will would leave the property equally to her family under the statute of descent or under the mistaken notion that if she had no will the bulk of her estate would pass to her sole surviving brother, Henry Merle and her sister, Bertha, cannot be determined. Her concern over the new will, however, could well have been determined by the court to have caused her to destroy and revoke her 1949 will in view of Mrs. Carr's relationship with all her nieces and nephews. There was evidence that she called Barbara Loss, the widow of her nephew, on the day she went to the hospital, telling her of money she had left in an envelope for her daughter's graduation. While it is a minor matter, it shows that on the very day she went to the hospital for the last time she was concerned about her grandnieces and members of the Loss family, none of whom are mentioned in the 1949 will. It is also noted that the share which would pass to Edward Loss, Jr., the only heir toward whom it appears Mrs. Carr had any animosity, would be only $\frac{1}{18}$ of Mrs. Carr's estate upon intestacy. There was even evidence to show that Edward Loss had visited Mrs. Carr and that the rift between them was not as great as it had been.

While the evidence indicates that Mrs. Carr talked to her brother, Mr. Merle, at all times in connection with making a new will, it is probable that if she destroyed her will, she would not tell him of this since this would be contrary to the interest of Mr. Merle and his daughter. Since Mrs. Carr was a meticulous record keeper and even obtained a receipt for a copy of her will every time she gave it to someone, it seems unlikely that the will could have been lost without some evidence showing where it was located. This supports the conclusion that Mrs. Carr did revoke the will by destroying it. For nearly 17 years she kept physical control of her

1949 will and it was last seen in February of 1966, about four months before her death. The evidence, therefore, would tend to support the court's conclusion that Mrs. Carr destroyed the 1949 will herself, intending to revoke it, rather than it was misplaced by Mrs. Carr who was so meticulous in keeping her records, etc. On the basis of the record, therefore, we do not believe we would be justified in asserting that the decision of the trial judge was contrary to the manifest weight of the evidence or that appellants had sustained the burden of overcoming the presumption that the will had been revoked.

An issue which was raised on appeal by appellee was the contention that it was error to admit the testimony of Henry Merle which he had given when the will was probated. Mr. Merle died between the date of probate of the will and the hearing on the will contest. It is not necessary that we decide this issue since the appellee has prevailed and this cause is being affirmed.

Appellants also had contended that the trial judge erred in limiting testimony concerning the relationship of Mrs. Carr with the beneficiaries under her 1949 will. On the basis of our examination of the record, it is apparent that appellants were given ample opportunity to present this type of evidence and we find no basis for any error committed in this respect.

Appellants, additionally, contended that the allowance of the sum of $750 to the Executor to prosecute an appeal from an order of the Circuit Court was such a modest sum as to amount to an abuse of discretion by the trial court. In the record in this cause, it is apparent that the notice of appeal was filed by the three beneficiaries under the 1949 will, and that thereafter the executor, Continental Illinois National Bank of Chicago also filed a notice of appeal. The trial court apparently took notice of the fact that the same attorney represented both the will beneficiaries and the executor and in the

light of this circumstance the trial judge determined that allowing $750 to the executor was adequate. On the basis of the record, therefore, we do not believe that we would be justified in finding that the trial judge abused his discretion in the allowance of such amount for fees and expenses.

Since we find no reversible error in the record, the judgment of the Circuit Court of Cook County will, therefore, be affirmed.

Affirmed.

RYAN, P. J. and STOUDER, J., concur.